**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 13-23881-CIV-MARTINEZ/GOODMAN**

GUARANTEE INSURANCE CO.,

Plaintiff,

v.

HEFFERNAN INSURANCE BROKERS, INC., et al.,

Defendants.
_______________________________________/

**ORDER DENYING MOTION FOR SANCTIONS**

When people suspect that suspicious circumstances establish the presence of intentional misconduct, they sometimes say, "where there's smoke, there's fire." It is surely true that the presence of smoke (the suspicious events) is sometimes linked to a fire (the unlawful or improper acts). But that is not always the case. Sometimes the existence of smoke means only that smoke is present, without the associated involvement of a problematic fire.

The smoke/fire metaphor is at the heart of Guarantee Insurance Company's ("Guarantee," or "Plaintiff") efforts to brand Defendants Heffernan Insurance Brokers, Inc. ("Heffernan") and Socius Insurance Services, Inc.'s ("Socius," and, together with Heffernan, "Defendants") discovery responses as both suspicious (i.e., smoky) and purposefully false (i.e., morphing from arguably incomplete into the inflammatory

allegation of intentional bad faith). To the extent that Defendants' discovery responses can be classified as deficient, inconsistent or incomplete, they cannot also be conclusively described now as necessarily being provided in bad faith. To be sure, the circumstances underlying the motion can be interpreted as problematic and potentially inculpatory. But they can also be viewed as innocent. The negative, mistrustful view urged by Plaintiff, while not wildly irrational, is not overpowering and does not preponderate over Defendants' explanations. For these reasons, as well as those outlined below, the Undersigned **denies** Guarantee's Motion for Sanctions Against Defendants for Discovery Violations (the "Motion") [ECF No. 151].[1]

## I. Background

Guarantee, a worker's compensation insurer, filed this case on the same day that it settled an underlying state litigation. That state litigation (the "Leon Tort Claim") was brought by Victor Leon, a worker's compensation claimant who sued Guarantee for intentional infliction of emotional distress based on its handling of his worker's

[1] A United States Magistrate Judge has authority to enter an order (as opposed to a report and recommendations) denying sanctions. *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 767, 683 n.2 (S.D. Fla. 2012) (noting that the nature of the sanctions actually imposed, if any, dictates whether a magistrate judge has authority to enter an order). *See generally Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) ("[e]ven [where] a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Federal Rule of Civil Procedure 72(a)).

compensation claim for an accident that occurred while he was employed by Altec Roofing. [ECF No. 27, p. 4]. Guarantee insured Altec Roofing. [*Id.*].

Defendants in the instant federal case are Guarantee's insurance agent and insurance broker. [*Id.* at 2]. Guarantee alleges that Defendants failed to timely notify its excess carrier insurer, Catlin, about the Leon Tort Claim, and that, as a result, Catlin refused to cover any portion of the Leon Tort Claim settlement amount. [*Id.* at 4-5]. Guarantee's claims against Defendants, for negligence and breach of fiduciary duty, seek as damages the amount that Catlin would have paid to Guarantee for the Leon Tort Claim settlement if it covered the claim in full. [*Id.* at 6-7].

Guarantee accuses Defendants of engaging in a cover up to hide from Guarantee the facts that: (1) Defendants did not realize they had failed to disclose the Leon Tort Claim to Catlin until 2011 (some two years late), (2) Defendants then engaged in an internal investigation of these issues, and decided to not report the claim to Catlin at that time, and (3) notwithstanding all of this, Defendants then put their *own* errors and omissions insurer on notice of their failure to timely notify Catlin but chose not to disclose these facts to Guarantee until 2013.[2] [ECF No. 151, pp. 3-4]. For ease of reference, these assertions will be referred to as the "Alleged Cover-Up."

---

[2] Guarantee is essentially arguing that Defendants engaged in a wide-reaching effort to cover up their failure to timely notify Catlin of the Leon Tort Claim, dating from some point in 2011. Much of this argument, including many of the *exact same sentences,* are also included in Guarantee's Motion to Amend Complaint by Interlineation to Add Request for Punitive Damages Based on Newly Discovered

According to Guarantee, it did not know about the Alleged Cover-Up until it took several depositions in June 2014. [ECF No. 151, p. 3]. Guarantee contends the Alleged Cover-Up is critically important and that Defendants engaged in sanctionable conduct by "improperly concealing [these] smoking gun facts in their discovery responses and deposition testimony." [ECF No. 151, p. 1]. Specifically, Guarantee argues that Kimberly Roman, Heffernan's Director of Operations, "lied in her [May 2014] deposition in an effort to throw Guarantee off the cover up trail," and that this conduct warrants the imposition of sanctions. [ECF No. 151, p. 8]. In addition, Guarantee argues that "Defendants' evasive or incomplete interrogatory answers also warrant the imposition of sanctions." [ECF No. 151, p. 11].

Guarantee argues that the alleged discovery violations by Defendants warrant the imposition of these sanctions: (a) recovery of the attorney's fees and costs it has incurred to date in this action, or, alternatively, attorney's fees and costs incurred since the earliest alleged discovery violation at issue here; and (b) striking Defendants' first and fifth affirmative defenses. [ECF No. 151, p. 14]. As its first affirmative defense, Defendants argue that Guarantee "was guilty of negligence and Guarantee's negligence was the sole, proximate cause or contributing cause of the damages complained of, and the recovery, if any, should be barred or reduced proportionately pursuant to the

---

Evidence. *Compare* [ECF No. 143, p. 2] *with* [ECF No. 151, p. 2]. However, the Motion before the Undersigned is a motion for sanctions *for discovery conduct*. It follows that **only Defendants' discovery conduct is at issue here, not their conduct before the filing of this litigation or outside of the discovery process**.

doctrine of comparative negligence." [ECF No. 36, p. 12]. As its fifth affirmative defense, Defendants argue that Guarantee is barred from bringing this action by "the Doctrine of Unclean Hands" because Guarantee "fraudulently concealed the Leon [Tort Claim] and lawsuit from Catlin in order to procure insurance from Catlin or at favorable rates." [ECF No. 36, p. 14].

**II. Analysis**

Discovery imposes costs on the litigant from whom discovery is sought, the party seeking discovery, and the judicial system itself. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997). It follows that courts have broad authority to enter sanctions for discovery misconduct, both pursuant to the inherent powers that "necessarily result to our Courts of justice from the nature of their institutions," and also pursuant to rules and statutes, including the Federal Rules of Civil Procedure. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 3 L. Ed. 259 (1812)); *see also Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993) (noting that district court has broad discretion to control discovery, including the ability to impose sanctions on uncooperative litigants.)

For instance, Federal Rule of Civil Procedure 26(g), which requires discovery documents to be signed and governs the effect of that required signature, was "designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993). In

addition, Federal Rule of Civil Procedure 37 confers broad discretion upon district courts "to fashion appropriate sanctions for the violation of discovery orders, [although] this discretion is not unbridled." *United States v. Certain Real Prop. Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir. 1997) (citing *Malautea,* 987 F.2d at 1542 and *Wouters v. Martin County,* 9 F.3d 924, 933 (11th Cir. 1993)); *see also Gratton v. Great Am. Commc'ns,* 178 F.3d 1373 (11th Cir. 1999) (noting Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and to ensure the integrity of the discovery process).

More importantly for purposes of this Motion, Rule 37 also imposes sanctions for a failure to disclose, to supplement an earlier discovery response, or to admit, unless that failure was substantially justified or harmless. Fed. R. Civ. P. 37(c). As noted, courts may impose discovery sanctions using their inherent power to manage their own affairs. However, a finding of bad faith is necessary to impose discovery sanctions based upon the court's inherent power. *In re Mroz,* 65 F.3d 1567, 1575 (11th Cir. 1995).

Rather than pinning its motion for sanctions to only a few of these various sources, Guarantee has instead opted to cite nearly all of them. [ECF No. 151, pp. 7-8]. This includes Rules 16(f), 37, 30(d), and 26(g) of the Federal Rules of Civil Procedure, as well as the Court's inherent authority to impose sanctions. [ECF No. 151, pp. 6-8]. In its argument for which sanctions are appropriate in this matter, Guarantee quotes *Steed v. Everhome Mortgage Co.*, 308 Fed. App'x 364, 371 (11th Cir. 2009), for the proposition that

"'discovery sanctions are intended to penalize the offending party and deter others from engaging in similar conduct.'" [ECF No. 151, p. 13]. At issue in the *Steed* case were sanctions entered pursuant to Rules 37(d) and 26(g) -- the rules most often cited to impose discovery-related sanctions in cases such as this one. In any event, as described below, the Undersigned does not view Defendants' conduct as sanctionable under any of the standards cited.

**1) There is no Conclusive Evidence Establishing that Kimberly Roman Lied in her Deposition.**

Guarantee took the depositions of a variety of personnel associated with Defendants on two separate days, May 20, 2014 (six depositions), and on June 12, 2014 (three depositions). Guarantee apparently did not know the key facts about the Alleged Cover-Up until June 12, 2014, when it took the deposition of Michal Mathews, the Guarantee account manager for Defendants at the time of these events. Mathews testified that she first discovered the Leon Tort Claim had not been reported to Catlin some time in 2011, during a routine review of Guarantee's insurance portfolio. [ECF No. 151, p. 3]. Mathews testified that "she informed Rick Allen, the broker in charge, and Kimberly Roman, Heffernan's director of operations, of this non-reporting on their part." [*Id.*]. Guarantee took Allen's deposition immediately after it took Mathews' deposition, and he corroborated Mathews' testimony that she told Allen, and Roman, about the failure to notify Catlin in 2011. [*Id.*].

Guarantee took Roman's deposition on May 20, 2014, almost a month before taking Mathews' deposition. The issue, in Guarantee's view, is that Roman lied in her deposition when she repeatedly stated that she did not know when she was first made aware of Defendants' failure to report the Leon Tort Claim to Catlin. The Undersigned has reviewed the significant portions of Roman's deposition.[3] In the Undersigned's view, there is insufficient evidence to justify discovery sanctions based on a finding that Roman lied in her deposition about this issue.

This conclusion, however, does not mean that Guarantee cannot raise Roman's deposition testimony at trial in an effort to impeach her.[4]

Roman is tasked with, among other things, handling insurance for Defendants and claims against them. [ECF No. 155-1, pp. 12, 16]. The line of questioning that Guarantee points to concerned the issue of when Roman first became involved in the matter, *i.e.*, the matter of Defendants' handling of the Leon Tort Claim on behalf of Guarantee.

---

[3] Guarantee failed to include the full Roman deposition as an exhibit to its Motion, and instead only included, as Exhibit C, two single deposition pages, one of which is the deposition cover page. [ECF No. 151-3]. The full deposition was attached as Exhibit A to Defendants' Response in Opposition to the Motion. [ECF No. 155-1].

[4] United States District Judge Jose E. Martinez is scheduled to preside over the trial, so it is Judge Martinez who will make the evidentiary rulings, including decisions on whether this type of potential cross-examination will be permitted. The Undersigned's comment that this Order does not preclude Guarantee from seeking to pursue this line of potential cross-examination is, of course, subject to the unremarkable reality that Judge Martinez, and not the Undersigned, is the ultimate evidentiary gatekeeper.

Roman testified that the first time she was involved in this matter was when she received a call from Mathews, who told her that it appeared the Leon Tort Claim was going to reach a higher amount than originally anticipated and that Defendants had not reported the Leon Tort Claim to Guarantee's excess insurer, Catlin. [*Id.* at 14]. This essentially corroborates the testimony of Mathews and Allen. At that time in her deposition, roughly 11:50 a.m., Roman testified that she could not remember when she first became aware of the issue (*i.e.*, when Mathews first told her), although she did offer to find out the date. [*Id.* at 14-16]. Then, slightly more than an hour later in her deposition (at 1:04 p.m.), she reconfirmed that Mathews was the one who reported the claim to her, and *also* stated that in preparation for the deposition she had found that the incident was reported to Defendants' E&O carrier on September 23, 2011. [*Id.* at 73.].

In Guarantee's view, this testimony -- about when Roman reported the incident to Defendants' E&O carrier -- evidences her previous lie that she did not know when Mathews first contacted her. [*Id.* at pp. 8-9]. The Undersigned is not convinced -- and it appears that Guarantee may be conflating the timing of two separate events. To be sure, it is possible that Roman lied in her deposition, but it is also plausible (and may be even more plausible) that Guarantee is confusing answers to two different questions.

Roman first testified that she did not know exactly when Mathews told her about the Catlin issue, and later testified to the exact date when the Catlin issue was reported to Defendants' E&O carrier. The dates of these two separate events may well be

different. Roman handled claims against Defendants such as the Catlin issue. It follows that while she could not recall exactly when Mathews first told her about the Catlin issue, it could easily have been sometime before (and likely only *shortly* before) September 23, 2011, when it was reported to Defendants' E&O carrier (a process she was involved in). There is no evidence, based on this information, conclusively proving that Roman was lying in her deposition.[5] In fact, Guarantee could have reasonably inferred from this information that Roman only learned of the failure to timely notify Catlin around that time, which of course prompted her to report the potential claim to Defendants' own E&O carrier.

Although Guarantee's interpretation is not irrational, it is not the only feasible interpretation. Given that the perjury alternative is only one of two permissible theories and given that the more-innocuous approach seems to the Court to be more likely, Roman's credibility is for the finder of fact to assess. The Undersigned declines Guarantee's invitation to conclusively brand her testimony as perjury and use it as a basis for sanctions.

---

[5] Guarantee's other evidence that Roman lied in her deposition testimony is that Defendants' counsel objected to and refused to let Roman answer a question asking whether there was concern that Defendants had failed to, but should have, notified Catlin about the Leon Tort Claim. [ECF No. 151, p. 9]. According to Guarantee, it "appears that, prior to the deposition, Roman was advised that information regarding Defendants' awareness of the error in 2011 was off limits." [*Id.*]. However, as noted, Roman *did* answer questions about when Defendants' E&O insurer was notified of the failure to report the Leon Tort Claim to Catlin, and specifically stated this was in 2011.

**2) Defendants' Discovery Responses are not Evasive or Incomplete in a Manner Warranting the Imposition of Sanctions.**

Guarantee argues that Defendants' responses to certain written discovery were purposely evasive and incomplete in order to further Defendants' Alleged Cover-Up. [ECF No. 151, p. 11]. Guarantee cites several examples: the answers to interrogatories #5(f) and #6(b), as well as a response to a Request for Admission. [*Id.* at 11-12]. In addition, Guarantee argues that Defendants were evasive in their Answer in responding to the allegation that "Defendants, for reasons unknown and unbeknownst to Guarantee, wholly failed to notify Catlin of the Leon claim." [ECF No. 151, p. 15].

Because Guarantee's Motion is for *discovery* sanctions, the Undersigned will not address any alleged deficiency in the Answer. Similarly, while Guarantee argues its exemplar discovery responses are just that -- examples -- the Undersigned will not review the entire 79 pages of Defendants' discovery responses attached to the Motion to find other potentially sanctionable discovery conduct. It is Guarantee's obligation to support its Motion with evidence *it* flags and pinpoints; it is not the Undersigned's job to track down the supporting information. Therefore, the Undersigned will review the three discovery response examples that Guarantee cites in the Motion, but I will not hunt through discovery responses in an effort to locate additional illustrations.

According to Guarantee, "a truthful, non-evasive or complete answer to [ ] interrogatories [5(f) and 6(b)] would have provided some indication that an error occurred [with respect to reporting the Leon Tort Claim to Catlin in 2009] and the error

was realized in 2011." [ECF No. 151, p. 12]. A review of Defendants' responses shows that they are not incomplete or evasive, however.

Interrogatory 5 contains six subparts. Subpart (f) asks:

> With respect to the October 23, 2009 demand letter ("October demand letter") referenced in the Second Amended Complaint in this matter, please explain, identify and/or describe . . . (a) [t]he steps you took, if any, to determine to which of Guarantee's insurers the Leon [Tort Claim] needed to be reported.

[ECF No. 151-6, p. 34].

First, it should be noted that Defendants responded to all six subparts of Interrogatory 5 in a single response without subparts, and this may in part have resulted in responses that were less comprehensive than they would have been had Guarantee propounded each interrogatory subpart as a separate interrogatory. This is not entirely Defendants' fault though.

Federal Rule of Civil Procedure 33(a) limits each party to 25 written interrogatories (absent stipulation or court order), inclusive of discrete subparts, but the rule does not define "discrete subparts." Fed. R. Civ. P. 33(a). Courts in this Circuit often use a "related question" test to determine whether a subpart is part of an interrogatory or is more properly considered a discrete, separate interrogatory. *See, e.g., Powell v. The Home Depot USA,* No. 07–80435–Civ, 2008 WL 2473748, at * 2 (S.D. Fla. June 16, 2008). Under the "related question" test, courts assess whether the subparts are "logically or factually subsumed within and necessarily related to the primary

question." *Oliver v. Orlando,* No. 06–CV–1671–Orl–21DAB, 2007 WL 3232227, at * 2 (M.D. Fla. Oct. 31, 2007). "[A]n interrogatory which contains subparts that inquire into discrete areas should, in most cases, be counted as more than one interrogatory." *Border Collie Rescue, Inc. v. Ryan,* No. 3:04–CV–568–J32–HTS, 2005 WL 662724, at * 1 (M.D. Fla. March 15, 2005) (internal quotations and citations omitted).

A review of Guarantee's First Set of Interrogatories shows that at least eight of the interrogatories contain subparts, depending on how one counts them. If each subpart were a separate interrogatory, Guarantee propounded 47 interrogatories -- significantly more than the amount allowed by rule. The Undersigned is not finding that each interrogatory subpart was a discrete interrogatory, or that Guarantee's interrogatories were somehow improper. But, the Undersigned does note that by choosing to include so many subparts, Guarantee essentially played a role in the response it received in return, which was a single response to all subparts in interrogatory 5. This single response may have been less detailed in terms of answering each interrogatory subpart than the response Guarantee would have received had it propounded the subparts, including subpart (f), as separate interrogatories.

In any event, while Guarantee contends that a truthful, non-evasive response to interrogatory 5(f) would necessarily have included acknowledgement that Defendants discovered in 2011 that they had not previously notified Catlin about the Leon Tort Claim, the Undersigned disagrees. [ECF No. 151, pp. 12-13]. The question is aimed at

the steps Defendants took to identify the carriers to whom it should report the claim, not *when* Defendants may have realized the claim was not reported to Catlin.

In their May 13, 2014 response to interrogatory 5(f), Defendants outline when they first were told by Guarantee about the Leon Tort Claim, and described several emails between Guarantee and Defendants, as well as internal emails among employees of Defendants at that time, regarding coverage and reporting the Leon Tort Claim. In addition, Defendants specifically state in their response that investigation remains ongoing and that the upcoming depositions (including the Mathews deposition, which Defendants specifically reference in their response) would reveal more information. The Mathews deposition, when Guarantee argues it first learned of the Alleged Cover Up, occurred less than one month later. The Undersigned will not, based on these facts, find that Defendants engaged in any discovery misconduct related to the response to this interrogatory or that Guarantee was somehow prejudiced by not learning more details for an additional few weeks.

Interrogatory #6 asks:

> Please explain (a) why you reported the Leon [Tort Claim] to XL in 2009 and (b) why you did not simultaneously (or shortly thereafter) report the Leon claim to Catlin . . . .[6]

---

[6] As Guarantee notes in its Motion, it asks each of the Defendants nearly identical interrogatories and each of the Defendants answered in a nearly identical way. [ECF No. 151, p. 12].

[ECF No. 151-6, p. 6]. Guarantee argues that in response to interrogatory subpart 6(b), Defendants should have admitted that they did not report the Leon Tort Claim to Catlin because Defendants "bungled the reporting." [ECF No. 151, p. 13]. But, in their response, Defendants do not even reach subpart b's substance, because they consider the predicate to be incorrect. Defendants state that they did not even report the Leon Tort Claim *to XL* in 2009. [ECF No. 151-6, p. 6]. As such, they could not have "simultaneously (or shortly thereafter) report[ed] the Leon [Tort Claim] to Catlin." Viewed in this light, Defendants' answer is not improper.

In addition, as with interrogatory 5(f), there is no real prejudice here. Guarantee has now learned (from the Mathews deposition) that Defendants were unaware the Leon Tort Claim had not been reported to Catlin until 2011, less than one month after Defendants responded to the interrogatories. The purpose of discovery is to "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1958). In this case, there is no evidence conclusively establishing that Defendants intentionally and improperly attempted to stymie the discovery process.

In fact, Defendants may well have not known the information which Mathews related in her deposition at the time they responded to the interrogatory a few weeks earlier. Moreover, even if they did know at the time, that information was not necessarily responsive to this interrogatory. In addition, the timeline of events is critical

in evaluating the Motion. The allegedly incomplete interrogatory responses were sent to Guarantee on May 15, 2014, the Mathews deposition uncovered the full picture about Defendants' actions on June 12, 2014, and Guarantee filed this Motion for Sanctions on August 25, 2014.

Guarantee has the information now, and even if its allegations of intentional, bad faith discovery shenanigans are true, Guarantee was deprived of that information for only some three to four weeks. Guarantee can properly prepare for trial with the information it has now obtained in discovery. The discovery period has not yet closed, and Guarantee will be able to (and has had ample time to) further follow up on these issues using the discovery process.

Guarantee also cites Defendants' response to Request for Admission #13 as evasive or incomplete.[7] Request for Admission #13 states:

> Admit that you did not report the Leon [Tort Claim] to Catlin contemporaneously with reporting the claim to XL because you forgot about the existence of the Catlin Policy.

Defendants denied this request for admission.[8] [ECF No. 151-5, pp. 6, 14]. Guarantee believes Defendants should have admitted here that they forgot to notify Catlin of the

---

7 Guarantee claims that Defendants' responses to *interrogatories* warrant the imposition of sanctions. But, in footnote 5 of its Motion, Guarantee also references the response to Request for Admission #13 as grounds for sanctions. [ECF No. 151, p. 11].

8 Defendant Heffernan actually admitted in part and denied in part this Request for Admission. [ECF No. 151-5, p. 6]. Heffernan admitted that *it* did not notify XL or

Leon Tort Claim. However, even now, Defendants do not admit that their failure to report the Leon Tort Claim to Catlin was an error, and in fact, this will likely be a key factual issue should this case proceed to trial.

Defendants have argued throughout this case, including in their affirmative defenses, that the decision not to notify Catlin was, at least in part, made by **Guarantee.** As Defendants note in their opposition brief, recent deposition testimony arguably bolsters their position. At a June 12, 2014 deposition, Rick Allen, a producer for Defendant Heffernan, testified that Defendants were not sure that Catlin should be notified of the Leon Tort Claim because it had been characterized as a meritless claim by Guarantee, and the decision of whether to report it to Catlin was at least in part Guarantee's. [ECF No. 143-1, pp. 11-12]. This is essentially Defendants' fifth affirmative defense, which argues Guarantee did not want the Leon Tort Claim reported to Catlin because it would negatively affect its ability to obtain insurance or the rate it would have to pay for that renewed insurance.

It may also be that in the immediate aftermath of first evaluating the Leon Tort Claim, no active, affirmative decision was ever made to notify or not notify Catlin, and that in fact, Defendants simply *forgot* to address the issue or follow through on it. But this is by no means a certainty. Instead, this is a factual issue to be resolved later. In addition, Defendants contend **Guarantee** also forgot to itself advise Catlin or to instruct

---

Caltin of the Leon Tort Claim, but states that Socius did. [*Id.*]. Aside from this limited admission, the RFA was denied.

Defendants to do so -- and that Guarantee itself had an obligation to do so. This is essentially the first affirmative defense, contributory negligence. In any event, there is no convincing evidence, based on this record, proving that Defendants intentionally and in bad faith[9] engaged in discovery misconduct in their response to Request for Admission #13.

## III. Conclusion

After reviewing the Roman deposition and the cited discovery responses, the Undersigned is not persuaded by Guarantee's argument that Defendants have engaged in bad faith discovery misconduct warranting the imposition of sanctions. There is no

---

[9] Guarantee suggests that Defendants' decision to notify their *own* E&O carrier on September 23, 2011 about the non-reporting of the Leon Tort Claim to Catlin without also advising Catlin or Guarantee at the same time is evidence of bad faith. This inconsistency in providing notice may be problematic for Defendants, but there may be an adequate, non-incriminating explanation. For example, when Roman first reported the events to the E&O carrier in 2011, it was reported as an *incident*, not a *claim.* Later, when Roman again notified the E&O carrier in September 2013, it appears as though she submitted it as an actual claim, as opposed to an incident. Given these factual issues, the Undersigned cannot simply pick which interpretation to accept and therefore cannot merely select Guarantee's view in order to impose sanctions. As noted above, though, this Order does not prevent Guarantee from arguing the Alleged Cover Up theory at trial, nor does it preclude cross-examination and possible impeachment of Defendants' witnesses. Of course, Judge Martinez is the judicial officer who will decide whether Guarantee may pursue this theory at trial.

evidence indisputably establishing that Defendants' discovery responses involved bad faith and Guarantee has not conclusively eliminated other non-problematic alternatives to explain Defendants' discovery responses. In addition, Guarantee learned the essential facts at issue less than a month after it argues they should have been disclosed, well before trial, and with time to conduct further discovery.

Therefore, the Undersigned's ruling will follow a **modified** version of the key lyrics from Deep Purple's 1972 heavy metal/hard rock hit song "Smoke on the Water," from the *Machine Head* album:[10] "Smoke on the water/ a fire [is not necessarily] in the sky."

Based on these findings, it is **ORDERED AND ADJUDGED** that Guarantee's Motion for Sanctions Against Defendants for Discovery Violations is **DENIED.** Guarantee may bring another motion for sanctions against Defendants for discovery violations should it uncover information that it believes warrants this type of extreme relief. In addition, this Order does not foreclose Guarantee from seeking to at trial impeach Defendants with their written discovery responses or with the deposition testimony of their employees and agents.

Finally, the Undersigned is not awarding attorney's fees to Defendants even though they prevailed on this motion. Guarantee's position was substantially justified

---

[10] (1972, Warner Bros. Records).

and the circumstances underlying the timing and inconsistencies of Defendant's discovery responses would make a fees award in their favor unjust.

**DONE AND ORDERED** in Chambers, in Miami, Florida, October 16, 2014.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
Honorable Jose E. Martinez
All Counsel of Record